**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

Kingsley B. Anderson

_____

_(In the space above enter the full name(s) of the plaintiff(s).)_

- against -

DAVID B. ROY

DBR PRACTICE MANAGEMENT LLC

THE JOINT CORP.

ROBERT J. MEEK

**COMPLAINT**

Jury Trial: ☒ Yes ☐ No

(check one)

_(In the space above enter the full name(s) of the defendant(s). If you
cannot fit the names of all of the defendants in the space provided,
please write "see attached" in the space above and attach an
additional sheet of paper with the full list of names. The names
listed in the above caption must be identical to those contained in
Part I. Addresses should not be included here.)_

**I.      Parties in this complaint:**

A.      List your name, address and telephone number. Do the same for any additional  plaintiffs named. Attach
        additional sheets of paper as necessary.

Plaintiff        Name                  Kingsley B. Anderson

                 Street Address        300 Somerset St. Apt. 138

                 County, City          Hudson County, Harrison

                 State & Zip Code      New Jersey, 07029

                 Telephone Number      973-432-1361

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this \_\_16\_\_ day of \_\_\_July_____, 20 \_18\_.

Signature of Plaintiff _____

Mailing Address \_\_300 Somerset St._____
\_\_Apt. 138, Harrison, New Jersey\_\_
\_\_07029, USA_____

Telephone Number \_\_973-432-1361\_\_\_\_\_

Fax Number *(if you have one)* _____

E-mail Address \_\_Kbraedenanderson@gmail.com\_\_

<u>N</u>ote:    All plaintiffs named in the caption of the complaint must date and sign the complaint.

Signature of Plaintiff: _____

B.  List all defendants. You should state the full name of the defendants, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant can be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Defendant No. 1

Name DAVID B. ROY

Street Address 29 Park Place #2203

County, City Forrest County, Hattiesburg

State & Zip Code Mississippi, 39402.

Defendant No. 2

Name DBR CHIRO/ DBR PRACTICE MANAGEMENT, LLC

Street Address 4209 Woodlark Dr

County, City Hillsborough, County, Tampa

State & Zip Code Florida, 33624

Defendant No. 3

Name THE JOINT CORP.

Street Address 16767 N. Perimeter Drive, St. 240

County, City Maricopa County, Scottsdale

State & Zip Code Arizona, 85260

Defendant No. 4

Name ROBERT J. MEEK ("Rob")

Street Address 4264 Laurel Ridge Cir.

County, City Broward County, Ft. Lauderdale

State & Zip Code New Jersey, 33331

## II.    Basis for Jurisdiction:

Federal courts are courts of limited jurisdiction. There are four types of cases that can be heard in federal court: 1) Federal Question - Under 28 U.S.C. § 1331, a case   involving the United States Constitution or federal laws or treaties is a federal question case; 2) Diversity of Citizenship - Under 28 U.S.C. §   1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case; 3) U.S. Government Plaintiff; and 4) U.S. Government Defendant.

A.    What is the basis for federal court jurisdiction? *(check all that apply)*

[X] Federal Questions          [X] Diversity of Citizenship

[ ] U.S. Government Plaintiff    [ ] U.S. Government Defendant

B.    If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue? The Securities Act of 1933, The Securities Act of 1934, 15 U.S.C.S. § 77E, 17CRF 240 10-B5, 18 U.S. CODE 1348, 15 U.S.CODE 77Q

- 2 -

C.    If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?

Plaintiff(s) state(s) of citizenship ___New Jersey___

Defendant(s) state(s) of citizenship ___Mississippi, Florida, Arizona___

**III.    Statement of Claim:**

State as briefly as possible the facts of your case.  Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.    Where did the events giving rise to your claim(s) occur? ___New Jersey___

B.    What date and approximate time did the events giving rise to your claim(s) occur? ___November 10, 2015___

| | |
|---|---|
| **What happened to you?** | C.    Facts: __I was fraudulently induced and solicited by David Roy in connection with the Defendants' sale of unregistered securities. The Defendants injurious communications induced the Plaintiff to rely on David Roy's representations that__ |
| **Who did what?** | __I would recieve a 33% interest stake in the Defendants practice Management company and Joint Corp. franchisee interest. Robert Meek colluded with David Roy to take advantage of the Plaintiff.__ |
| **Was anyone else involved?** | __In addition to the defendants named above, Jim Meek was also involved and is believed to have a stake in DBR practice Management.__ |
| **Who else saw what happened?** | __My wife, Kylie M. Anderson.__ __My mother, Lori Anderson__ __John Strohsahl, David Roy's attorney__ |

- 3 -

**IV.    Injuries:**

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received. financial losses of $300,000, and emotional distress and embarassment sustained as a natural and ordinary consequence to being manipulated into losing his entire settlement reward money that the plaintiff idicated was for, and the defendant understood that, would be needed for the plaintiff's future medical care and treatments for serious injuries that cause the plaintiff daily pain.

**V.    Relief:**

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation.

The Plaintiff suffered losses of $300,000 as a result of the defendants' sale of an unregistered security and false statements.

The Plaintiff seeks $300,000, which the defendant obtained by the sale of an unregistered security.

The Plaintiff also seeks punitive damages in the amount of $6,325,000. Punitive damages are appropriate here due to the intentional and deliberate nature of the defendants' conduct in this case. Additionally, public policy supports punitive damages, due to the unequal bargaining power, and disparity of wealth and sophistication between the parties.

-4-

1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

------------------------------------------------------------ x

KINGSLEY B. ANDERSON,

          *Plaintiff,*                            Civil No. _____

    *v.*

DAVID B. ROY,

DBR PRACTICE MANAGEMENT LLC,

THE JOINT CORP. (JYNT),

ROBERT J. MEEK.

          *Defendants.*

------------------------------------------------------------ x

**PARTIES**

1. The Defendant, ("DAVID B. ROY"), is a resident and citizen of Mississippi.

2. The Defendant, ("DBR PRACTICE MANAGEMENT LLC"), is organized under Florida law, has its principal place of business in the state of Florida, and owns and controls a corporate bank account in Florida. Thus, DBR PRACTICE MANAGEMENT is a Florida citizen. DBR PRACTICE MANAGEMENT LLC was created by DAVID B. ROY to sell unregistered securities to the Plaintiff in violation of the Securities Act of 1933.

3. The Defendant, ("THE JOINT CORP."), is incorporated under Delaware law and it is headquartered in Arizona. Therefore, the JOINT CORP. is an Arizona citizen. THE JOINT CORP. ("JYNT") is a public company listed on NASDAQ. THE JOINT CORP. is a franchisor with over four-hundred (400) total U.S. locations, five (5) of which are located in New Jersey.

DAVID B. ROY is a franchisee of THE JOINT CORP who purports own several franchise locations in South Florida. DAVID B. ROY sold an unregistered security interest in said franchise location to the Plaintiff in November 2015.

4. The Defendant, (ROBERT J. MEEK), is domiciled in Florida and is a citizen of Florida. ROBERT J. MEEK has acted, at all times, as an agent of the above-mentioned Defendants and is therefore joint and severally liable for his involvement during and throughout the facts pleaded above.

5. The Plaintiff, ("KINGSLEY B. ANDERSON") is a New Jersey resident. The Plaintiff has been a New Jersey resident since the spring of 2015 when he accepted both a full-tuition scholarship to attend Seton Hall University School of Law and athletic aid to play for the Seton Hall University's NCAA Men's Basketball team. KINGSLEY B. ANDERSON is domiciled in the state of New Jersey. The Plaintiff is physically present in the state, has his home residence in the state, and has the intent to remain in New Jersey. Furthermore, the Plaintiff is married to a New Jersey citizen, and is the father of a minor child who is a New Jersey citizen. And finally, the Plaintiff recently received his Juris Doctor degree from a New Jersey law school, will sit for the Uniform Bar Exam, and will assumably soon receive a New Jersey law license.

### FACTUAL AND PROCEDURAL BACKGROUND

1. The Plaintiff, ("KINGSLEY BRAEDEN ANDERSON"), resides in Harrison, New Jersey. The Plaintiff has lived in New Jersey since May of 2015 and intends to remain in New Jersey for the foreseeable future. He moved to New Jersey in 2015 to attend Seton Hall University School of Law and play basketball for the Seton Hall Pirates Men's varsity team. Anderson played for the 2015-2016 Pirates while attending Law School and his team won the Big East Conference Tournament championship. This achievement was featured as a prominent story in the New

3

York Times. Anderson graduated from Law School in May of 2018 and is a current Uniform Bar Examinee who will sit for the July 24, 2018 Bar Examination. In the Fall of 2018, Anderson will be joining Sidley Austin LLP as a full-time Associate.

2. In 2013, the Plaintiff was involved in a very serious car crash, as a result of a drunk driver, that left him nearly paralyzed. He broke his spine and shattered his C-5 and C-6 vertebrae, leaving him hospitalized for nearly two months. Although he was given only a 0.6% chance of making a full recovery by the initial attending physician, with the help of Gene Caragee at Stanford Medical Hospital, the Plaintiff was able to walk again. Anderson, however, was an All-American basketball player playing in the NCAA for Fresno State at the time of injury, and although Anderson did manage to land at Seton Hall two years later, as a result of such injury, was never able to compete at the same level again. Indeed, the Plaintiff suffered a very serious neck injury. Anderson has permanent daily pain, and crippling movement limitations. As a result, Anderson sought and obtained a settlement from the drunk driver's insurance company in an amount over $500,000.

3. The doctors informed the Plaintiff that he would likely not be able to have a full-length career (on or off the court), therefore, the Plaintiff knew he needed to invest his settlement money wisely – and safely, so that he would have money to live off of as his health continued to deteriorate and his disability worsened. It is commonly known and recognized in the medical community that patients who suffer injuries like the one suffered by the Plaintiff will have lifelong impairments and ensuing disabilities. The Defendant, a physician himself, was aware of these facts and communicated to the Plaintiff that his settlement money was in "good hands."

4. The Plaintiff indicated to Robert Meek that he was likely going to be successful in his settlement for future medical treatment and Robert Meek put the Plaintiff in contact with the

Defendant shortly thereafter. The Plaintiff's uncle, Robert Meek, heard about the Plaintiff's settlement and told the Plaintiff during both in-person conversations and phone conversations that the Defendant was a "very wise and sophisticated business man that may be able to help [the Plaintiff] triple or quadruple" the Plaintiff's money. Robert Meek made these statements while visiting Plaintiff and attending the Plaintiff's college graduation in May of 2015, and also throughout the Spring of 2015. The Plaintiff spoke with the Defendant for the in the Summer/Spring of 2015 regarding an "investment opportunity." However, the Plaintiff recalls that the Defendant began initiate conversations with the Plaintiff through both his uncle Robert Meek and through phone calls prior to this in-person meeting, and indeed this initially began in the Fall of 2014 in anticipation that the Plaintiff would soon receive a cash settlement as a result of the Plaintiff's neck injuries. The Defendant told the Plaintiff about a business called "the Joint Chiropractic." During this phone conversation, the Defendant taught the Plaintiff about his "investment strategy" and explained how franchising worked and explained that it was "much less risky" than other business ventures because you basically just have to "follow the instructions." This phone conversation later resulted in a face-to-face meeting with the Defendant's attorney.

5.  The Plaintiff's uncle was in a very questionable financial condition and the Defendant further promised the Plaintiff that if he invested $300,000 or more into his practice management company, in addition to receiving "high returns" and a "great education in business," the Defendant would also hire the Plaintiff's uncle. The Defendant continued to use this as leverage throughout the events surrounding this transaction, and would continuously threaten to fire the Plaintiff's uncle if the Plaintiff would not agree to "put more money in."

6. Throughout the course of the Defendant's dealings with the Plaintiff, the Defendant told him that he was a "very successful business man" and had "lots of profitable businesses." The Defendant bragged about his business success and explained that he was also a franchisee of a business called "Plato's Closet," a thrift clothing store. He personally guaranteed that if the Plaintiff invested his settlement money into "The Joint," the Plaintiff would be "rich" very soon. The Defendant was a longtime friend of his uncle's, therefore, the Plaintiff trusted him and believed him. Indeed, the Defendant and Robert often indicated that the Plaintiff was "lucky to be doing business with such an experienced businessman at such a young age." The Plaintiff was approximately 22 years old, and fresh out of college when he was fraudulently induced into transferring $300,000 into the Defendant's Wells Fargo Bank Account in reliance on false promises and representations which the Defendant made to the Plaintiff regarding the Plaintiff's ability to get "rich" and be an equal owner of the Joint Corp. franchise. (Exh. A).

7. The Defendant changed the form / terms of the Plaintiff's investment on multiple occasions, citing the need to do a few various "legal tricks." The Defendant stated that things were complicated because in Florida, "only physicians can own medical practices" (which the Joint apparently qualified as). Therefore, the Defendant and his attorney John Strohsahl stated that they would need to "get creative." The Plaintiff asked numerous questions about how and why this would be so complicated, but he was not given clear answers. Often the Defendant would dismiss the Plaintiff's questions and concerns as being "stupid" and would frequently hang up on the Plaintiff when attempts to clarify and be given assurances were made. After changing the plan multiple times, the Defendant and David Strohsahl stated that they would need to structure the Plaintiff's investment as a loan and an equity share together, as a "hybrid" deal. The Plaintiff asked Robert Meek and the Defendant about the specific terms or the agreement

and whether it was legal but was never given a clear answer. The Plaintiff explained that due to his status as a law student, it was very important to him that everything the Defendant was doing was "100% legit." The Defendant and John Strohsahl confirmed that the structure was "legal," but declined to turn over copies to the Plaintiff after numerous attempts to obtain such documentation.

8. The Joint Corp. is a chiropractic franchise, a company that prohibits ownership by those other than licensed physicians. David B. Roy is a licensed physician and is the owner of Pine Belt Dermatology. The Defendant has vast knowledge and skill in the operation and management of medical offices and was the sole owner of DBR Practice Management and the only legal owner of The Joint Corp.  The Defendant knowingly and purposely sold the Plaintiff an investment interest in his Joint Corp. franchises in violation of both federal securities laws and Florida's prohibiting the ownership of medical offices within the State. The Defendant knowingly and purposely omitted facts relevant to the existence of this law, and fraudulently induced the Plaintiff into investing $300,000 into the Joint Corp. (Exh. A).

9. The Defendant represented that "the best way" to do this was "probably a promissory note." The Defendant further represented that he had various attorneys who could "write it up." The Defendant and Robert Meek introduced the Plaintiff to John Strohsahl and represented to the Plaintiff that Strohsahl was a competent lawyer in the area of business and corporate law. John Strohsahl further represented himself to be such during and throughout 2015. The Defendant and John Strohsahl told the Plaintiff that because this offering was "not really a loan," they did not need to give the Plaintiff "that much interest." Unfortunately, as a minority with a modest upbringing and very limited financial literacy, the Plaintiff was not aware of the nature of the transaction. The Plaintiff was, at the time, a 22-year-old college athlete with zero investment

experience, the Plaintiff was not an effective negotiator. The Defendant declared that the Plaintiff's interest would be 5% but promised the Plaintiff that he would receive a 33% equity stake in his "Practice Management" business. Specifically, the Plaintiff was to be paid 5% interest in monthly payments beginning immediately.

10. Again, as a naïve "college kid" with no investment experience at the time, the Plaintiff was not aware of the substantial unfairness and inherent red flags as they were occurring. The Plaintiff remembers that he was given something to sign, which he did in fact sign, but he is unsure what the exact terms of the agreement were. As stated, the Plaintiff was not given a copy of the agreement, nor was the Plaintiff provided with counsel at any point during this transaction. The Plaintiff requested a copy of the agreement on several occasions, however, the Plaintiff did not receive one.

11. The Defendant represented to the Plaintiff that himself (Dr. Roy), the Plaintiff (B. Anderson), and Robert (Plaintiff's uncle) would be equal owners of the business and make decisions jointly. The Defendant represented the following arrangement:

   (1) Robert will not put forth any equity, but instead, would be employed by DBR Practice Management LLC as a Manager at near minimum wage, in exchange for 33%;

   (2) Defendant will put forth $300,000 in exchange for 33%, and would own and manage the Joint Corp. franchise through DBR Practice Management LLC;

   (3) Plaintiff (B. Anderson) would put in $300,000 in exchange for 33% and would equally own and manage the Joint Corp. franchise through DBR Practice Management LLC.

12. The initial investment opportunity that the Defendant presented to the Plaintiff was for the purchase one franchise license and the construction of one office, of which the Defendant and the Plaintiff would share profits; however, the number of offices that the Defendant intended

to purchase continuously grew higher and higher as the Defendant began to demand more and more money. One office, quickly evolved to two, from two to four, and so on. The Plaintiff is currently not aware of the precise number; however, the Plaintiff predicts that the Defendant has built approximately four or five offices using the Plaintiff's funds.

13. In reliance on the promises and representations made by the Defendant, above, on November 10, 2015, the Plaintiff wired "D.B.R. Practice Management LLC (David B. Roy)," a Franchisee of "The Joint Chiropractic" $280,000 from his Bank of America Bank Account, ending in 0665. This amount was sent to the Defendant's Wells Fargo Bank Account ending in 8551 with an accompanying description indicating that the funds were being transferred for the purpose of "capital injection/infusion." The other $20,000, the Defendant directed should go to Robert's landlord to pay for his "living expenses." The Defendant indicated that because Robert was being paid so little, the "business" would pay for his rent. The Plaintiff was not afforded any decision-making authority regarding such decision, nor was the Plaintiff ever involved in making decisions on behalf of the business. The Defendant, communicating through Robert, directed that the Plaintiff's $20,000 (which was to represent a year's rent) should be sent to Robert's landlord. The Plaintiff made such transfer at the Defendant's request at the inception of their business venture, and as such, should be considered part of the $300,000 total unregistered security offering amount.

14. In early 2016, the Defendant demanded more money from the Plaintiff. The Defendant explained that he wanted to expand and purchase additional offices, and therefore, the percentage that the Plaintiff had been given "would go down drastically" unless he agreed immediately to "put more money in." The Plaintiff truthfully responded that he "did not have any" more money. The Plaintiff was a first-year law student at the time and had roughly $0

monthly income. The Defendant was aware of this fact, but nonetheless, was extremely angry and stated that if the Plaintiff could not put any more money in, he would not make any interest payments for "awhile." Due to the Plaintiff's lack of knowledge as to his rights under the circumstances, he did not protest. The Plaintiff was made to feel guilty regarding his inability to contribute more, and therefore, the Plaintiff was made to believe that he was unable to make meaningful demands. The Defendant continuously threatened and manipulated the Plaintiff regarding the Defendant's ability to simply "bankrupt" the business if the Plaintiff would not agree to invest more money. The Defendant is a very smart and intimidating individual and uses a great deal of pressure and influence to get what he wanted. The Defendant is indeed a powerful white male living in the United States, is a sophisticated investor, and is a practicing dermatologist in Mississippi. The Plaintiff was a poor mixed-race law student with little to zero investment experience.

15. The Defendant explained that "Dr. Miller" another franchisee in the area had "passed away" and there was an opportunity to grab "a bunch more offices for cheap." The Plaintiff again indicated that he did not have any more money right now, but explained that perhaps after he graduated from law school he would be able to contribute more. The Defendant then solicited another investor, Jim Meek, to "loan" him the money. The Plaintiff is unaware of the precise terms of this loan, however, the Plaintiff has been informed that Jim Meek's interest rate was significantly higher than his. Additionally, to the best of the Plaintiff's knowledge, Jim Meek has been paid his interest payments in full without default.

16. In mid-2016, the Defendant again demanded money and explained how expensive it was becoming to launch so many offices at once. The Plaintiff explained during a phone conversation that he "did not have anything to do with" the Defendant's decision to "purchase

additional offices," and therefore, the Plaintiff was not responsible for any of such business decisions. Indeed, the Plaintiff in fact did not have "anything to do with" the Defendant's control and management of the business.

17. In late-2016, the Defendant was angry due to a phone conversation in which the Defendant was incessantly verbally attacking Robert, and the Plaintiff defended him. The Plaintiff asked the Defendant to please "keep his cool" and to treat Robert and the Plaintiff with "respect." The Defendant told the Plaintiff and Robert that they would "never get a dime from [him,] and that [he] was done," hanging up the phone thereafter.

18. At no point did the Defendant did not involve the Plaintiff in any of the major business decisions, nor did the Plaintiff receive notice regarding any of his purchases. DBR Practice Management LLC never held any regular or special meetings or voted on any matters. Additionally, the Plaintiff was rarely given the opportunity to discuss our share his thoughts during 2015-2016 and was never afforded any opportunity from 2016 until present.

19. Again, in late-2016, Defendant demanded more money yet again, this time through Robert, and the Plaintiff again explained that he had no more money. The Defendant was angered by this response and stated that he was going to "move forward with or without [Plaintiff]," and that the Plaintiff's "poor decision" would "cost [him]."

20. The Defendant was very paranoid about speaking through e-mail. The Defendant would frequently request that conversations take place over the phone and not e-mail. Only on very seldom occasions did the Defendant send the Plaintiff substantive e-mails. On the occasions where the Defendant did send e-mails, the Defendant showed a clear intent to attempt to protect himself from subsequent liability. The Defendant would overexaggerate small mistakes made by Robert and would constantly find new ways to deflect responsibility for his actions.

However, the Defendant did send the Plaintiff an e-mail in late 2016, after the Plaintiff refused to pay him more money. In such e-mail, the Defendant proceeded to perform random calculations showing a drastic change in the Plaintiff's equity percentage (Exh. B). The new calculations would be as follows:

Rob - 19.17%

Braeden - 19.17%

Dave - 51.12%

Jim - 10.54%

21. The Plaintiff did not respond to this e-mail. The Plaintiff did not believe that he had any power or control in the situation. The Defendant made all of the business's decisions unilaterally, and therefore, the Plaintiff feared that there was nothing he could do. Nothing was ever placed in the Plaintiff's name, and he was never given any legal or agency rights with respect to the business. After sending email, which purported to change the equity percentages, the Defendant ceased to speak to the Plaintiff or involve the Plaintiff in any further discussions for nearly two years. The Plaintiff would ask his uncle Robert how things were going with the business every once and awhile, but he would never receive clear answers. The Plaintiff was typically told that things were "okay," or things were "better today," but was never given any information that would allow a reasonable person to determine the reality of the business's financial health or otherwise make determinations regarding the activities and actions of the business.

22. The Plaintiff was indeed thoroughly kept in the dark. The Defendant frequently relayed messages to Robert, informing him to tell the Plaintiff that he would likely never get his money back unless he allowed the Defendant to keep not paying any interest payments. The Plaintiff

was not aware until recently that Jim Meek was actually receiving interest payments at a higher rate that the Plaintiff was, and in fact was receiving full payment of such interest payments (which is true even now).

23. The Plaintiff was not afforded the type of involvement or decision-making ability that the Defendant indicated he would have. In fact, the Plaintiff knows, and knew, very little about DBR Practice Management LLC. The Plaintiff was never given financial records or statements and has never been given access or control of any business property. The Plaintiff further has never been afforded the opportunity to vote on important matters, nor has he received notice for any business decisions made since mid 2016. The Plaintiff has not seen tax statements, filing, accounting statements, or any other financial statements regarding the Defendant's "business."

24. In fact, the Defendant recently fired Robert without the Plaintiff's knowledge, consent, notice, vote, or discussion regarding the matter. The Plaintiff would later discover from Robert that Defendant had apparently been firing and un-firing Robert on a weekly and monthly basis for the past year and a half in an alleged effort to torment Robert into higher "productivity." Finally, in April 2018, the Defendant officially fired Robert without the Plaintiff's knowledge, vote, or consent. The Plaintiff has no information as to the on-going state of the business or how things are being run. The Defendant's only communications have been those indicating that the business failed because the Plaintiff did not "put more money in," and the Defendant repeatedly has indicated that the Plaintiff will not be paid a single dime. The Defendant recently asked the Plaintiff to sign a document that says that the Defendant "don't owe [Plaintiff] shit," however, the Plaintiff has refused to sign such a document – and Dr. Roy proceeded to hang-up the phone on the Plaintiff in response to the Plaintiff's non-acquiescence. (Exh. C).

25. The Plaintiff indicated to Dr. Roy approximately thirty days ago, through his apparent attorney, John Strohsahl, that the Plaintiff would give him 30 days in good faith, to either: (1) repay the Plaintiff's principal investment, or (2) resume making interest payments. (Exh. D). The Defendant has not responded during this 30-day period, nor has the Plaintiff heard from John Strohsahl. Defendant has refused to pay the Plaintiff anything still today and has indicated through Robert that he is going to "bankrupt the business" if the Plaintiff does not agree to sign something "relieving him of liability." (Exh. E). The Defendant has made extensive attempts to avoid e-mail communicate wherever possible, and therefore has preferred to speak through intermediaries like John Strohsahl and Robert Meek. (Exh. D and Exh. C).

26. The Defendant has been providing Robert with a vehicle and has contributed to Robert's living expenses in consideration for his support and loyalty. Therefore, the Plaintiff does not expect Robert, nor Jim, to testify favorably for the Plaintiff during this case. There is recent evidence to suggest that Jim Meek, Robert Meek, John Strohsahl, and David B. Roy are all now in cahoots. (Exh. E).The interests between the parties are clearly misaligned, therefore, the above parties have since began to "gang up" on the Plaintiff during recent e-mail correspondences. In a recent text message, the Plaintiff's uncle Robert communicated to the Plaintiff that he was "so fucking pissed" at the Plaintiff for asserting his rights under the federal securities laws. (Exh. F).

27. The Plaintiff was sold unregistered security. The Plaintiff did not have any investing experience at the time, and he had no idea what a security even was. The Defendant tricked and manipulated the Plaintiff into giving away his life savings and settlement money. The Plaintiff needed that money for his continuing need for medical treatment, and to pay the Plaintiff's living expenses when his disability becomes too crippling to allow him to work. The

Defendant promised the Plaintiff that he was an "experienced" business man and that I would make "way more money" through the joint than in the stock market. The Defendant typically spoke in exaggerated terms, but rarely gave exact percentages for profit estimates. Instead, he would use words like "very rich" and "massive gains."  The Plaintiff initially wanted to put the settlement money into the stock market, specifically, Netflix and Facebook stocks, but the Defendant convinced him that Franchising was like "free money." The Defendant told the Plaintiff that he would have an "equal share in ownership and be able to participate in running the business." However, the Plaintiff has had no such opportunity. The Defendant has breached their agreement on numerous occasions, committed several torts, and violated both state and federal securities laws. The Plaintiff did reach out to law enforcement or file a claim sooner because he was fearful that the Defendant would retaliate. The Defendant was very influential on the Plaintiff and convinced him that it was the Plaintiff's "fault" that the business was not profitable, and therefore, the Plaintiff had "no right" to receive his interest payments. In fact, the Defendant still maintains this position.

28. The Defendant manipulated the Plaintiff and fraudulently misappropriated every penny the Plaintiff had. The Defendant caused the Plaintiff to suffer $300,000 in losses. The Plaintiff lost his entire savings. The Plaintiff expressly told the Defendant that this was the "settlement money" contained in his settlement was "very important that it be invested carefully." The Defendant told the Plaintiff in response that he was "too young" to understand, and that he would "handle" the Plaintiff's settlement money. The Defendant fraudulently sold the Plaintiff unregistered securities in violation of securities laws and targeted the Plaintiff due to his settlement reward.

29. The Plaintiff is entitled to relief under, and the Defendant has actually, knowingly and purposely committed violations of, the following claims and applicable laws and statutes:

**FEDERAL CLAIMS**

1. Sale of Unregistered Securities (15 U.S.C.S. § 77E)
2. Fraud in Connection with the Sale of Securities (17 CFR 240.10b-5)
3. Securities and Commodities Fraud (18 U.S. Code § 1348)
4. Fraudulent Interstate Transactions (15 U.S. Code § 77q)

**STATE LAW CLAIMS**

5. Common Law Fraud (N.J. Stat. Ann. § 2A:14-1)
6. Consumer Fraud Act Violation (N.J.S.A. §§ 56:8-1 – 56:8-184)
7. Oppression of a Minority Shareholder (N.J.S.A. 14A:12-7(b)(1)(c))
8. Breach of Contract
9. Tortious Interference with Contractual and Business Relations
10. Refusal to Permit Inspection of Books and Records
11. Breach of Fiduciary Duty
12. Corporate Waste
13. Shareholder's Derivative Action

**PERSONAL JURISDICTION**

1. This Court has personal jurisdiction over the Defendant based on the nationwide service of process provision provided in 15 U.S.C. § 78aa, which has been interpreted to provide personal jurisdiction in any district court for a securities claim against any defendant with minimum contacts with the United States. See, e.g., Equidyne Corp. v. Does, 279 F. Supp. 2d 481 (D. Del. 2003) (citing Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 295 (3d Cir. 1985)).

2. The Plaintiff also asserts pendent personal jurisdiction over the state law claims based on the jurisdiction granted under § 78aa. See IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056-57 (2d Cir. 1993). Under this doctrine, where a "federal statute authorizes nationwide service of process, and the federal and state claims 'derive from a common nucleus of operative

fact,' the district court may assert personal jurisdiction over the parties." See <u>Robinson v. Penn Central Co., 484 F.2d 553, 555 (3d Cir. 1973)</u>.

3. The Due Process clause of the U.S. Constitution requires that the Defendants have "certain minimum contacts" with the forum state, such that the "maintenance of the suit does not offend traditional notions of fair play and substantial justice." <u>Int'l Shoe v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)</u>. Moreover, this Court has sufficient contacts to the Defendant because this cause of action arose from the Defendant's "forum-related activities." <u>Mellon Bank (EAST) v. DiVeronica Bros., 983 F.2d 551, 554 (3d Cir. 1993)</u>. The Defendant did knowingly and purposely sell unregistered securities to the Plaintiff and cause the Plaintiff to suffer $300,000 in losses. The Defendant accepted these fraudulently induced funds, which were sent from the Plaintiff's Checking Account at Bank of America, located in South Orange, New Jersey. All of the communications that have given rise to the claim contained within this Complaint have indeed occurred in New Jersey.

4. The Court has specific jurisdiction over the Defendant in this case. This Complaint alleges facts that show that Defendants' clear purpose was for his fraudulent, injurious and tortious communications to reach the Plaintiff in New Jersey. The Defendant directed his communications at the Plaintiff, knowing that the Plaintiff was a New Jersey resident. The Defendant was aware, and has always been aware, that the Plaintiff is a resident of New Jersey. The Defendant was also aware of that fact when the Defendant solicited the Plaintiff and fraudulently induced the Plaintiff to "invest" or "loan" the Defendant money for a purported business venture in violation of the securities laws, which clearly stablishes that the Defendant knowingly and purposely availed himself of jurisdiction in New Jersey.

5. Finally, granting personal jurisdiction in this case would be fair and reasonable. The facts alleged are not the result of "random, fortuitous, or unattenuated contacts." See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). The Defendant's contacts to the forum state represent a sufficient showing of "purposeful availment" on the part of the Defendant. The Defendant knowingly and purposely targeted a 22-year-old New Jersey college student with a severe neck and spinal injury, who the Defendant knew recently experienced an accession to wealth and convinced the him to invest all or substantially all of his settlement money into an unregistered security. The Defendant fraudulently induced the Plaintiff to make this transfer through the use of false and misleading statements, all directed to, and received by, the Plaintiff, of whom the Defendant knew or had reason to know, was New Jersey resident.

6. Further, this Court also personal jurisdiction over DBR Practice Management LLC. The Defendant was the sole legal owner of this entity and was acting as and on behalf of this company throughout the Defendant's fraudulent solicitation regarding, and offering of, unregistered securities. Through agency, DBR Practice Management LLC is bound by David B. Roy's actions and representations made in connection with the transactions involving the Plaintiff's $300,000 investment in said company. Specifically, when David B. Roy contracted with and unduly targeted the Plaintiff, it had the effect of causing DBR Practice Management LLC to communicate with and solicit the Plaintiff as well. Therefore, DBR Practice Management LLC did knowingly and purposely engage with and solicit the Plaintiff in connection with a sale of its own unregistered securities in violation of federal securities laws.

7. This Court also personal jurisdiction over the Joint Corp. The Joint Corp. has purposely availed itself of jurisdiction in New Jersey due to its substantial and significant contacts with the State.

The Joint Corp. franchise has issued licenses to, and maintains ultimate control of, five (5) franchise locations in the state of New Jersey. As an agent with apparent authority to act on behalf of the Joint Corp., when David B. Roy contracted with and unduly targeted the Plaintiff, it had the effect of causing the Joint Corp. to communicate with and solicit the Plaintiff as well. Therefore, the Joint Corp. did knowingly and purposely engage with and solicit the Plaintiff in connection with a sale of its own unregistered securities in violation of federal securities laws.

8. Under the Federal Rule of Civil Procedure 4(e) this Court's jurisdiction is co-extensive or supplemental jurisdiction with that of New Jersey state courts, which extend it to the maximum range permitted by the Constitution. Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).

## VENUE

9. Venue is proper for similar reasons. Venue is proper in a securities law case "where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district." Oxford First Corp. v. PNC Liquidating Corp., 372 F. Supp. 191, 197 (E.D. Pa. 1974). All of the Plaintiff's claims involve the disposition of the "loan" or "investment" moneys transferred from New Jersey. The claims properly contained within this Complaint arise directly out of the injurious misrepresentations that the Defendant knowingly made personally, and at times conveyed through third parties, directly towards, and with, the Plaintiff. See 28 U.S.C. § 1391(a)(2). The Defendant made the majority of these injurious conversations over the phone and through e-mail. However, in New Jersey, the controlling caselaw in New Jersey makes no distinction between calling or e-mailing for venue purposes, instead courts focus on whether the representations were

knowingly communicated to a Plaintiff in New Jersey. See Richards v. Aramark Services, Inc., 108 F.3d 925, 928 (8th Cir. 1997). New Jersey has a significant relationship to the dispute and venue is proper here.

## SUBJECT MATTER JURISDICTION

1. This Court has both federal question jurisdiction and diversity jurisdiction over the claims and parties contained within this Complaint.

2. U.S. district courts have original jurisdiction over all civil actions arising under the Constitution, federal laws or treaties of the United States. In order to satisfy the requirements for federal question jurisdiction, a "federal question" must appear in the plaintiff's well-pleaded complaint. The Plaintiff has indeed asserted colorable causes of action and set out a well-pleaded basis for such claims. Specifically, the Plaintiff has asserted causes of action that arise under Federal Securities laws in connection with the Defendant's unregistered sale of securities and made false statements contemporaneous with such offering. The Plaintiff's claims under 15 U.S.C.S. § 77E, 18 U.S. CODE § 1348, and 15 U.S. Code § 77Q clearly give rise to federal question jurisdiction.

3. This Court also has diversity jurisdiction over this case. Diversity jurisdiction where there is complete diversity, and there is a case or controversy that exceeds $75,000. See 28 U.S. Code § 1332. The Plaintiff is a New Jersey resident and is domiciled in New Jersey. David B. Roy (Defendant) is a domiciled of Mississippi. DBR Practice Management LLC (Defendant) is domiciled in Florida. And finally, the Joint Corp. (Defendant) is domiciled in Arizona. Therefore, there is complete diversity for the purposes of subject matter jurisdiction. Further, the Plaintiff's claims exceed $75,000. The Plaintiff suffered losses of $300,000 as a result of

the Defendants' sale of an unregistered security and false statements. The Plaintiff also asserts punitive damages in the amount of $6,325,000.

## CHOICE OF LAW

1. With regard to certain claims brought by the Plaintiff, given the diversity of the parties, the court must first determine which state law should apply. *Montich v. Miele USA, Inc.,* 849 F. Supp. 2d 439, 444 (D.N.J. 2012). A federal court sitting in "diversity" is bound to apply the choice of law rules of the forum state, New Jersey. *McFarland v. Miller,* 14 F.3d 912, 917 (3d Cir. 1994) (citing *Van Dusen v. Barrack,* 376 U.S. 612, 644-46 (1964)).

2. This court sits in New Jersey, therefore New Jersey choice of law rules should apply. *See McFarland,* 14F.3d at 917. In the past, "rigid principals" governed New Jersey choice of law. *NL Industries, Inc. v. Commercial Union Ins. Co.,* 65 F.3d 314, 319 (1995). However, New Jersey has since moved towards a more flexible approach. *Id.* For example, instead of "rigidly" applying the state laws of which the contracting occurred in all circumstances, New Jersey law now dictates that the court determine which state has the "most meaningful connections and interests in the transaction and the parties." *Id.* at 319 (citing *Buzzone v. Hartford Ac. and Indem. Co.,* 129 A.2d 561 (1957)); *See State Farm Mut. Auto Ins. Co. v. Simmons' Estate,* 84 N.J. 28, 417 (1980).

## JUSTICIABILITY AND STANDING

1. The U.S. Supreme Court has established a three-part test for standing. The "irreducible constitutional minimum of standing" requires the plaintiff to establish:

First ... an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent," not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be

"likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); see also Summers, 555 U.S. at 493. In this case, these requirements are met. The Plaintiff has suffered concrete and particularized losses in the form of $300,000 in settlement dollars that the Defendant knowingly and purposely sold to the Plaintiff in violation of Section 12, and various other 10b-5 provisions and federal securities laws. Further it is likely that a favorable ruling would be redressed by a favorable decision.

2. This action is timely brought. Rule 10b-5 must be brought not later than the earlier of two (2) years after the discovery of the facts constituting the violation, or five (5) years "after such violation." The Plaintiff did not discover that he was fraudulently sold an unregistered security until Spring of 2018. The Plaintiff discovered facts relevant to make such determination from Robert Meek, after the Defendant fired Robert Meek without the Plaintiff's knowledge. The Plaintiff was also made aware of the Defendant's conduct due to recently being made aware that Jim Meek had been receiving regular interest payments for over two years, while the Plaintiff did not receive any payments. In June of 2018, the Defendant communicated to the Plaintiff, through phone and e-mail, that various inflammatory statements and false assertions had been made. The Defendant informed the Plaintiff that his money was "gone" and that the Plaintiff must sign a statement stating that the Defendant did not "owe [the Plaintiff] shit." This is what gave the Plaintiff the requisite knowledge of the situation to inquire further as to his rights under the federal securities laws and other claims. The sale and purchase of the fraudulently sold unregistered security occurred in November 2015. Therefore, the Plaintiff has certainly plead in a timely manner and this case is redressable by this Court.

3. Under section 12, the Plaintiff is authorized the to bring a private civil action to rescind the purchase if the seller uses a materially false or misleading prospectus or makes materially false or misleading oral statements in connection with the sale. Section 12 requires that the Plaintiff bring the rescission action within "one year after the discovery of the untrue statement or omission, or within one year after such discovery should have been made by the exercise of due diligence, and in not more than three years from the relevant sale." 15 U.S. Code § 77m. The sale was made less than three years ago, in November 10, 2015. The Statute therefore does not expire until November 10, 2018. Additionally, the Plaintiff only made the discovered the truth behind the Defendants conduct and the nature of his losses in the Spring of 2018. As indicated above, the Defendant refused to speak to the Plaintiff or tell the Plaintiff about any of the business's activities for over two years. The Plaintiff had no reasonable way of knowing that the Defendant did not in fact give the Plaintiff a valid interest in the Joint Corp. franchise. Indeed, the Defendant used the Plaintiff's uncle to influence the mind of the Plaintiff. The Plaintiff only discovered this fact as a result of the Defendants' boasting that the Plaintiff would "never get a dime" during recent communications during the months of May-July 2018. The Plaintiff was also put on notice due to the Defendant's recent firing of Robert Meek. This caused Robert Meek to come clean to the Plaintiff regarding the questionable nature, and fraudulently induced, in which the Defendant had seized the Plaintiff's settlement money. Robert has since made attempts to rescind and disconfirm these statements, likely due to undue duress and financial pressure being placed on Robert by the Defendant. The Defendant has been providing Robert with a vehicle and has contributed to Robert's living expenses in consideration for his support and loyalty. Therefore, the Plaintiff does not expect Robert, nor Jim, to testify favorably for the Plaintiff during this case. There is recent evidence to suggest

that Jim Meek, Robert Meek, John Strohsahl, and David B. Roy are all now in cahoots. The interests between the parties are clearly misaligned, therefore, the above parties have since began to "gang up" on the Plaintiff during recent e-mail correspondences. In a recent text message, the Plaintiff's uncle Robert communicated to the Plaintiff that he was "so fucking pissed" at the Plaintiff for asserting his rights under the federal securities laws.

4.  In New Jersey, the statute of limitations is six (6) years for fraud. N.J. Stat. Ann. § 2A:14-1. And the statute of limitations is also six (6) years for non-sales contracts. N.J. Stat. Ann. § 2A:14-1; and four (4) years for contracts for the sale of goods under the Uniform Commercial Code. N.J. Stat. Ann. § 12A:2-725. Additionally, the statute of limitations is six (6) years for claims under the New Jersey Consumer Fraud Act. Kennedy v. Axa Equitable Life Ins., Co., 2007 WL 2688881, at 2 (D.N.J. Sep. 11, 2007). The statute of limitations is six years for claims of tortious interference with a contract. In re Bernheim Litig., 290 B.R. 249, 258 (D.N.J. 2003). All of the Plaintiff's state laws have been timely brought.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, the Plaintiff hereby demands a trial by jury in the above-captioned action of all issues triable by jury under the U.S. Constitution.

## DISCUSSION

VIOLATIONS OF FEDERAL LAWS

UNREGISTERED SALE OF SECURITIES IN VIOLATION OF 15 U.S.C.S. § 77E

1.  The Defendant knowingly and purposely sold the Plaintiff unregistered securities in violation of 15 U.S.C.S. § 77E. Section 2 (1) of the Act defines the term "security" to include the commonly known instruments and documents traded or held for to purpose of speculation or investment. This includes (1) certificates of interest or participation in any profit-sharing

24

agreement; (2) investment contracts; and (3) any interest or instrument commonly known as a security. SEC v. W. J. Howey Co., 328 U.S. 293, 297-301, 66 S. Ct. 1100, 1102-04 (1946). In this seminal case, the Howey Test asks whether the value of a transaction for one of its participants is dependent upon the other's work. Specifically, the Howey Test determines that a transaction represents an investment contract if a person "invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." Id.

2.  For example, in SEC v. W.J. Howey Co., a citrus farm leased out half of its large property in order to "finance an additional development" and sold service contracts to investors through promises that their investment would generate a profit. See Id. None of the investors targeted by the defendant had the "knowledge, skill, and equipment necessary for the care and cultivation of citrus trees," therefore, they were speculators. See Id. The U.S Supreme Court indicated, "the transactions in this case clearly involve investment contracts, as so defined. The respondent companies are offering something more than fee simple interests in land...they are offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise." See Id. Thus, the transaction needed to be registered, and the Howey Co. was found to have violated the law by failing to do that. SEC v. W. J. Howey Co., 328 U.S. 293, 297-301, 66 S. Ct. 1100, 1102-04 (1946).

3.  In contrast, in United Hous. Found., Inc. v. Forman, 421 U.S. 837, 95 S. Ct. 2051 (1975), the court applied the "economic realities test" and determined that the offering was not a security. a cooperative housing corporation, required its residents to buy "shares" of the co-op and such money from shares was used to defray initial costs. Id. The economic realities test essentially asks whether an offering "looks and smells" like a security. Id. But more specifically, the

economic realities test asks whether Economic Realities test asks whether this is the type of investor, or investment that requires the protection of federal securities laws. See United Hous. Found., Inc. v. Forman, 421 U.S. 837, 95 S. Ct. 2051 (1975). The tenants/shareholders sued, claiming they were deceived in the purchase of these securities. See Id. The Court determined that because shareholder rights were not proportionate to specific number or percentage of shares, and the shares could not appreciate, the Court held that the "stock was not purchased in expectation of profits." Id.

4. In this case, DAVID B. ROY knowingly and purposely sold the Plaintiff an unregistered security in violation of federal securities laws. The Plaintiff is certainly the kind of Plaintiff that securities laws were designed to protect. See United Hous. Found., Inc. v. Forman, 421 U.S. 837, 95 S. Ct. 2051 (1975). The Plaintiff only acquired the funds to purchase the Defendant's securities by virtue of his receipt of a settlement he received in connection with a near-fatal car crash in which the Plaintiff was very seriously injured by a drunk driver. The Plaintiff had only recently reached the age required to purchase a bottle of beer when the Plaintiff had this accession to wealth and was quickly targeted and taken advantage of by the Defendant.

5. The Defendant knew that the Plaintiff was expected to receive, and then did receive, a large cash settlement through the Defendant's friendship with the Plaintiff's uncle. The Defendant used his relationship with the Plaintiff's uncle to control and manipulate the Plaintiff, and consequently defraud the Plaintiff, in connection with his solicitation and sale of unregistered securities. Additionally, the Plaintiff had absolutely zero investment or financial experience or business sophistication. The Defendant, David B. Roy, knowingly targeted the Plaintiff and used his greater experience and business sophistication to take advantage of him. Therefore,

the Plaintiff was clearly the type of person/investor that the securities laws were designed to protect. Further, this offering was clearly the type of transaction in which the federal securities laws were meant to address. David B. Roy sold the Plaintiff a 33% interest stake in DBR Practice Management LLC, a shell company for his franchise of The Joint Corp, through promises and representations that the Plaintiff's investment would increase in value. Moreover, the Defendant, David B. Roy, represented to the Plaintiff that an investment in DBR Practice Management LLC would be highly profitable. The Plaintiff represented that he desperately needed to make a safe and secure investment that would increase in value. The Plaintiff explained that he had initially desired to put his settlement money into the stock market, specifically referencing Netflix and Facebook stock. The Defendant claimed and represented to the Plaintiff during multiple phone calls, and one in-person meeting, between the years 2014 and 2016 that an investment in the Defendants' the Joint Corp. franchisee interest and DBR Practice Management LLC would be a more suitable investment for the Plaintiff. The Plaintiff relied on these statements in connection with his acceptance of the Defendants offer to purchase and 33% stake in his business's future profits.

6. Further, the Plaintiff clearly did not have "knowledge, skill, and equipment necessary" for the operation of a chiropractic clinic or establishment in the medical industry. The Joint Corp. is a chiropractic franchise, a company that prohibits ownership by those other than licensed physicians. David B. Roy is a licensed physician and is the owner of Pine Belt Dermatology. The Defendant has vast knowledge and skill in the operation and management of medical offices and was the sole owner of DBR Practice Management and the only legal owner of The Joint Corp. Therefore, the Plaintiff was clearly a speculator as defined by United Hous. Found., Inc. v. Forman, 421 U.S. 837, 95 S. Ct. 2051 (1975). Additionally, Plaintiff's interest and

expectations of profit in the Defendant's practice management company depended solely on David B. Roy's knowledge, skills, and medical license. Therefore, the Plaintiff clearly meets and satisfies all of the elements of both the "Howey test" and the "economic realities" test. See id; also see SEC v. W. J. Howey Co., 328 U.S. 293, 297-301, 66 S. Ct. 1100, 1102-04 (1946).

7. The legal issue in this case turns upon a determination of whether, under the circumstances, the solicitation and sale of a 33% interest stake, through contract, constitute an "investment contract" within the meaning of § 2 (1). As the Plaintiff will further demonstrate, the Plaintiff's interest did in fact constitute an investment contract, bringing into operation the registration requirements of § 5 (a). This investment contract was, however, not registered under the requirements of § 5 (a), nor was it granted any exemptions under § 3 (b).

8. The Plaintiff has provided the court's interpretation of the term "investment contract," but it is undefined by the Securities Act. However, this term has been broadly construed by state and federal courts to "afford the investing public a full measure of protection. Form was disregarded for substance and emphasis was placed upon economic reality." SEC v. W. J. Howey Co., 328 U.S. 293, 297-301, 66 S. Ct. 1100, 1102-04 (1946). Courts have held that the term "investment contract" is a contract or scheme for "the placing of capital or laying out of money in a way intended to secure income or profit from its employment." State v. Gopher Tire & Rubber Co., 146 Minn. 52, 56, 177 N. W. 937, 938; also see Id. This definition has been commonly and uniformly applied by state and federal courts in "situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves." SEC v. W. J. Howey Co., 328 U.S. 293, 297-301, 66 S. Ct. 1100, 1102-04 (1946). Again, as noted above, the Plaintiff clearly did not have "knowledge, skill, and equipment

necessary" for the operation of a chiropractic clinic or establishment in the medical industry. The Defendant did not share ownership or management responsibilities or privileges with the Plaintiff, nor would the Plaintiff have the expertise or acumen necessary to participate in these activities. Therefore, again, the Plaintiff's interest and expectations of profit in the Defendant's practice management company depended solely on David B. Roy's knowledge, skills, and medical license.

9. Federal courts have described the Howey test as a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." SEC v. W. J. Howey Co., 328 U.S. 293, 297-301, 66 S. Ct. 1100, 1102-04 (1946). In applying this flexible approach, the Plaintiff is clearly entitled to relief, because transactions in this case clearly involve investment contracts as so defined. David B. Roy made this offering to an investor that lived in New Jersey, knowing that the Joint Corp. offices and DBR Practice Management LLC were located in Florida, with the majority of business operations to be performed, and decisions to be made, by the Defendant who would remain living in Mississippi. Robert Meek was a low-level employee and acted as David B. Roy's agent during this period and unknowingly participated in the Defendant's scheme to capture the Plaintiff's settlement money.

10. The Securities Act prohibits the offer as well as the sale of unregistered, non-exempt securities in the amount of $300,000. For the reasons stated above, David B. Roy's sale and offer directed to and received by the Plaintiff, constituted such. Therefore, the Plaintiff is entitled to compensatory damages in the amount of $300,000.

<u>SECURITIES AND COMMODITIES FRAUD IN VIOLATION OF 18 U.S. CODE § 1348</u>

11. Under 18 U.S. Code § 1348, a Defendant shall not knowingly execute, or attempt to execute, a scheme or artifice "to defraud any person" in connection with any "security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934." See 15 U.S.C. 78. This statute also prohibits Defendants from obtaining or soliciting funds from an investor "by means of false or fraudulent pretenses, representations, or promises." Id.

12. Under the facts pled above and consistently throughout this well pleaded complaint, the Plaintiff is entitled to relief. The Defendant fraudulently induced the Plaintiff to cause an amount of $300,000 to be transferred from the Plaintiff into a business bank account that Defendant controlled. The Defendant caused this transfer to occur through subjecting the Plaintiff to unconscionable and undue pressure to enter into the agreement. Further, the Defendant falsely stated that the Plaintiff did own, and could legally own, a 33% stake in the Defendant's practice management company. The Defendant also falsely stated that an investment in the Joint Corp. was a far superior investment to alternative options, notably, an investment in Facebook and Netflix stock, as previously stated.

<u>FRAUDULENT INTERSTATE TRANSACTIONS IN VIOLATION OF 15 U.S. Code § 77Q</u>

13. Under 15 U.S. Code § 77Q, the Defendant shall not offer or sell any securities through the use of communication in interstate commerce "to employ any device, scheme, or artifice" to defraud any person, or to engage in "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

14. Under the facts pled above and consistently throughout this well pleaded complaint, the Plaintiff is entitled to relief. The Defendant knew or had reason to know that the Plaintiff could not legally own any interest in the Joint Corp. franchise, yet the Defendant consistently represented to the Plaintiff that he would not only own 33% of his practice management company, but also that the Plaintiff would have a meaningful opportunity to participate in the management of the business. The representations made by the Defendant were false. Moreover, these communications were made through the utilization of interstate commerce communications.

15. DBR Practice Management LLC and the Joint Corp. are jointly and severally liable for the losses and damages caused by David B. Roy's actions. The Joint Corp. knew or should have known that David B. Roy was selling unregistered securities and promising equity interest in the Joint Corp. David B. Roy is a franchisee of the Joint Corp. and has purchased several franchise licenses from the company. David B. Roy underwent an application process concerning his intention to become a Joint Corp. franchisee and was in fact approved. During the course of this application, the Defendant was required to attend training sessions at the Joint Corp.'s headquarters in Arizona. As a matter of usual course of business, during this application process, the David B. Roy was likely required to indicate to Joint Corp. the manner in which he intended to own, operate, and fund the franchise. David B. Roy represented to the Plaintiff that he was capable of giving the Plaintiff an interest in the future profits of the Joint Corp. franchise. Therefore, in acting as the Joint Corp.'s agent, David B. Roy caused the Plaintiff to justifiably to rely upon the care or skill of such status. It was reasonable to believe that David B. Roy had such status due to his medical license and ownership of other medical practices. It is reasonable and fair to subject Joint Corp. to liability for the $300,000 losses and

other harms caused by the "lack of care or skill of the one appearing to be a servant or other agent as if he were such." Drexel v. Union Prescription Ctrs., 582 F.2d 781, 783 (3d Cir. 1978). It does not matter whether David B. Roy had actual authority to bind the Joint Corp. to transactions involving its franchise interests. Indeed, it is sufficient that David B. Roy appeared to be acting as the Joint Corp.'s agent when he made false statements in connection with the sale of unregistered securities and directed those communications, which induced such action, at the Plaintiff, knowing that the Plaintiff was a New Jersey resident. The Joint Corp. is bound by David B. Roy actions, and clearly subjected itself to liability.

STATE LAW VIOLATIONS

1. The Defendant has knowingly and purposely committed the following violations and acted, or failed to act in a manner which resulted in the violation of, the following:

   (1.1) VIOLATIONS OF THE NEW JERSEY SECURITIES LAWS (N.J.S.A. 49:3-47);

   (1.2) COMMON LAW FRAUD (N.J. STAT. ANN. § 2A:14-1); and

   CONSUMER FRAUD ACT VIOLATION (N.J.S.A. §§ 56:8-1 – 56:8-184)

   (1.3) OPPRESSION OF A MINORITY SHAREHOLDER (N.J.S.A. 14A:12-7(B)(1)(C))

   (1.4) COMMON LAW BREACH OF CONTRACT

   (1.5) TORTIOUS INTERFERENCE

   (1.6) BREACH OF FIDUCIARY DUTY

2. The above claimed are clearly subsumed within under the facts pled above and consistently throughout this well pleaded complaint. The facts pled above demonstrate the required factual basis for relief and pleads particular facts giving rise to the claims therein. Therefore, Plaintiff

is entitled to relief and an award of damages as a result of the Defendant violations of the state laws listed above.

## DAMAGES AND RELIEF

1. The Plaintiff suffered losses of $300,000 as a result of the Defendants' sale of an unregistered security and false statements. The Plaintiff seeks full repudiation of his $300,000, which were fraudulently obtained by the Defendant through the sale of an unregistered security. The Plaintiff also seeks punitive damages in the amount of $6,325,000.

2. The Securities Act of 1933 and the Securities Exchange Act of 1934 create express civil remedies for certain violations of the securities laws. More important in recent years, however, has been the implied right to private actions under the general anti-fraud provisions under Rule 10b-5 and Section 17(a).

3. Punishment is usually not a function of the civil law, but "[w]here the defendant's wrongdoing has been intentional and deliberate and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award in the tort action 'punitive' or 'exemplary' damages." W. Prosser, *Handbook of the Law of Torts* § 2, At 10 (3d Ed. 1964). As such, punitive damages serve the purposes of both individual and general deterrence and of proper retribution for the Plaintiff's harms.

4. Punitive damages are appropriate here. The Defendants' purposely defrauded and misled the Plaintiff, causing the Plaintiff to suffer extraordinary losses. The unequal bargaining power, and wealth and sophistication disparity between the parties at the time of contracting, creates a necessary public policy in favor of awarding punitive damages.

## SIGNATURE - RULE 11

Dated: 7/16/2018

Respectfully submitted,

s/ Kingsley B. Anderson

PRO SE PLAINTIFF

300 Somerset St. Apt. 138, Harrison, New Jersey 07029

973-432-1361